## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

KINDRA D. IRVING,  )
)
    **Plaintiff,**  )
)
    v.  )    **Case number 4:04cv1606 TCM**
)
JO ANNE B. BARNHART,  )
Commissioner of Social Security,  )
)
    **Defendant.**  )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Kindra D. Irving's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b. Ms. Irving ("Plaintiff") has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied for DIB and SSI in August 2002, alleging a disability since the month before caused by lupus, rheumatoid arthritis, and asthma. (R. at 36-38, 328-29, 335-36.)[2]

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

Her applications were denied. (Id. at 27, 29-33, 330-34, 337-42.) Subsequently, a hearing was held, at Plaintiff's request, in April 2004 before Administrative Law Judge ("ALJ") Thomas C. Muldoon. (Id. at 347-61.) The ALJ determined that Plaintiff was not under a disability at any time on or before the date of his decision, and denied her applications. (Id. at 13-20.) The Appeals Council denied review of that decision, effectively adopting the decision as the final decision of the Commissioner. (Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the 20-minute administrative hearing.

In response to her attorney's questions, Plaintiff testified she was born on June 15, 1976, and was then 27 years old. (Id. at 350.) She was five feet two inches tall and weighed 275 pounds. (Id. at 350-51.) She had gained approximately 80 pounds during the previous year because of the prednisone she was taking. (Id. at 351.) She had completed two years of college. (Id. at 350.) She lived with her husband. (Id.)

Plaintiff last worked in November 2002 as a health information specialist with a hospital's medical records department. (Id. at 351.) She held that job for two weeks. (Id.) She had to quit because of chest pains, stress, and fatigue. (Id. at 352.) Before that she worked at the humane society. (Id.) She had to quit that job because of the stress and being unable to care for the animals the way they should be. (Id.) Before that she worked for Blockbuster for two years as an assistant store manager. (Id.) That job required that she stand for almost ten hours and lift four or five 60-pound boxes. (Id.) She had to quit that

job because she was often tired and the combination of people complaining and having to stand all day caused her feet to swell and bad calluses. (<u>Id.</u> at 353.) Before Blockbuster, she worked as a teller at Bank of America. (<u>Id.</u>) And, before that job, she worked as a cook. (<u>Id.</u>)

Plaintiff explained that she could no longer perform any of her previous jobs. (<u>Id.</u>) She could no longer do the standing or walking the jobs required. (<u>Id.</u> at 354.) She became easily frustrated and stressed. (<u>Id.</u>) She fell asleep easily. (<u>Id.</u>)

Asked to explain her health problems, Plaintiff testified that lupus caused her chronic fatigue, chest pain, and joint pains in her ankles, knees, hips, hands, wrists, and shoulders. (<u>Id.</u>) On a scale of one to ten, with ten being the most severe pain, her joint pain was a six on a daily basis. (<u>Id.</u>) When it was, she took Aleve. (<u>Id.</u>) If that did not work within four to six hours, she took Darvocet. (<u>Id.</u>) If that did not work, and it usually did, she would then take Percocet. (<u>Id.</u> at 355.) If that did not work, she went to the emergency room. (<u>Id.</u>) The location of her joint pain varied; for example, one day her knees would hurt, another day her hips would. (<u>Id.</u>)

Plaintiff was tired every day. (<u>Id.</u>) She would wake up tired afer sleeping for eight hours. (<u>Id.</u>) And, she had problems daily with swelling. (<u>Id.</u>) Her hands were usually swollen when she woke up. (<u>Id.</u>) Lately, her legs and feet were swollen on a daily basis. (<u>Id.</u> at 356.)

Plaintiff further testified that she consulted a rheumatologist and was diagnosed with systemic lupus erythematosus in November 1999. (<u>Id.</u> at 355.) She also has asthma, arthritis

in her wrists and hips, and carpal tunnel syndrome in both wrists. (<u>Id.</u> at 356.) Lately, she has been suffering from depression. (<u>Id.</u>) She feels isolated and lacks the energy or motivation to do anything. (<u>Id.</u>) She is also paranoid and nervous. (<u>Id.</u>)

Plaintiff takes Lexapro for depression. (<u>Id.</u>) She does not see a psychiatrist or a therapist. (<u>Id.</u>)

Her medications cause side effects. (<u>Id.</u> at 357.) The prednisone causes weight gain, paranoia, nervousness, and moodiness. (<u>Id.</u>) The CellCept causes nausea and stomach cramps. (<u>Id.</u>) The Bextra gives her headaches. (<u>Id.</u>) The Vistaril that she takes for the itchiness caused by the lupus makes her sleepy. (<u>Id.</u>) If she needs to sleep and cannot, she takes Restoril and that makes her lose her appetite. (<u>Id.</u>)

Plaintiff reported that she had been to the emergency room 12 to 14 times during the last two years. (<u>Id.</u>) The last time was for swelling. (<u>Id.</u>) One time was for a miscarriage. (<u>Id.</u> at 358.) The other times it was for chest pain or the lupus. (<u>Id.</u>)

Plaintiff usually spends her days trying to find something to do around her house. (<u>Id.</u>) She will go through paperwork or junk, "just busy work[.]" (<u>Id.</u>) After about 45 minutes, she will be sleepy or stuck in a position she cannot get out of. (<u>Id.</u>) Three or four days a week she just stays in bed. (<u>Id.</u>) She seldom drives, and cooks only once a week. (<u>Id.</u> at 359.) Twice a month, she drives to visit her grandparents. (<u>Id.</u>) She schedules her doctors appointments so her husband can drive her. (<u>Id.</u>) She seldom goes out to eat, to movies, or to church. (<u>Id.</u>) She tries to clean her house, but usually only makes it through one room. (<u>Id.</u> at 360.) Her husband does the grocery shopping. (<u>Id.</u>)

Plaintiff does enjoy shopping, but only does it once every three or four months. (Id.) When she does, however, she usually ends up having to go to bed because of the pain. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

On a pain questionnaire, Plaintiff described her pain as a throbbing, sharp pain in her hands, arms, shoulders, and ankles and as a dull ache in her lower back. (Id. at 70.) She had the pain when she woke up and when she went to bed. (Id.) It was worse when she did repetitious movements, e.g., typing or writing. (Id.) Sometimes, it was as bad when she was bending or straightening up. (Id.) In a claimant questionnaire, Plaintiff explained that she was always tired, irritated, and moody. (Id. at 66.) She needed help getting dressed or undressed or tying her shoes. (Id.) She had anxiety attacks. (Id.) Her symptoms were caused by everyday movements and became worse with repetitive movements. (Id.) Her current medications included Vitrosil, prednisone, CellCept, Bextra, Darvocet, Nortryptyline, and Protonix. (Id.) Each was prescribed by Dr. Ince and was to be taken daily. (Id.) Among other side effects, her medications made her sleepy so she waited to take them if she was going to work or was running errands. (Id.) At that time, she lived alone. (Id. at 67.) Her mother cooked her meals for her and left them for her to heat up in the microwave. (Id.) She could not stand or walk for long periods of time. (Id.) She required help carrying laundry back and forth from the basement, and could not wash many pots or pans. (Id.) She

did not watch much television, but read as much as her ability to concentrate permitted. (Id. at 68.)  She became nervous and paranoid when she was driving.  (Id.)  She left her house at least once a day, but became fatigued if she stayed away too long.  (Id.)

Plaintiff completed another form when requesting a hearing.  (Id. at 89-90.)  She described her lupus and depression as getting worse.  (Id. at 89.)  Her daily activities had decreased dramatically.  (Id.)

On a "Work History Report," Plaintiff listed eight job titles.  (Id. at 71.)  The most recent were adoption counselor for the Humane Society, manager, teller, cook, sales clerk, retail supervisor, secretary, and data entry clerk.  (Id.)  The job she held for the longest, for almost three years, was that of a manger with Blockbuster.  (Id. at 53.)  Her last six years' annual earnings, including in 2002, were all in excess of $21,000.  (Id. at 41.)

The relevant medical records[3] before the ALJ begin in December 2000 when her primary care physician, Mamta Varshney, M.D., referred her to the Rheumatology Clinic at St. Louis University ("SLU") Health Sciences Center.  (Id. at 99-101.)   Amjad Roumany, M.D., and Akgun Ince, M.D., wrote Dr. Varshney in February 2001 that, based on various laboratory data and tests and on Plaintiff's medical history and current complaints, they had concluded the most likely diagnosis was systemic lupus erythematosus ("SLE"[4] or lupus).

---

[3]Other records, e.g., those relating to her miscarriages, are not discussed unless relevant information is contained therein.

[4]SLE is "an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions . . . pleurisy or pericarditis . . . anemia . . ."  Stedman's Medical Dictionary 1001 (26th ed. 1995) (alterations added).

(Id. at 101.)  They also noted that she had a history of arthritis, leukopenia, and pleuritic chest pain and a previous diagnosis of rheumatoid arthritis.  (Id. at 99, 101.)  They started her on hydroxychloroquine ("HCQ") and prescribed a low dosage of prednisone to stabilize her symptoms.  (Id. at 101.)  She was to return for a follow-up visit in four to six weeks. (Id.)

Plaintiff did return in March.  (Id. at 103-04.)  Her prednisone dosage was increased. (Id. at 103.)  Additionally, she was started on Celebrex, but the previously-prescribed Naprosyn was discontinued.  (Id.)  She continued to have pain when she inhaled, but was in no apparent distress when examined.  (Id.)  A chest x-ray was normal.  (Id. at 144.)

Two days later, on March 11, Plaintiff went to the SLU emergency room with complaints of a sore throat, nausea, vomiting, mouth ulcers, and chest and back pain.  (Id. at 145, 147, 149.)  Cough medication was not helping.  (Id. at 149.)  On examination, her nose and throat were congested, her ears were normal.  (Id. at 147.)  Plaintiff was prescribed some medication and told to return if her symptoms worsened.  (Id.)

On March 15, x-rays of Plaintiff's cervical spine were taken.  (Id. at 152.)  The results were normal.  (Id.)

Plaintiff next consulted Dr. Varshney in April.  (Id. at 107.)  It was then thought that she might also have neuropathy.  (Id.)  Consequently, she was given a referral to the Neurology Clinic.  (Id.)

On May 21, Plaintiff consulted the Neurology Clinic at S. Louis University.  (Id. at 108-15.)  The physician, Ghazala Hayat, M.D., noted that Plaintiff had formerly been

diagnosed with rheumatoid arthritis, but had recently been diagnosed with SLE after waking up one night to realize her left arm was numb and that she could not move it for at least 15 minutes. (<u>Id.</u> at 108.) She had continued to experience numbness in her extremities and pain in her ankles. (<u>Id.</u> at 108, 113.) She had also had an episode of back and chest pain in January 2001. (<u>Id.</u> at 113.) She had been given a steroid injection in her shoulder and back, and that had helped. (<u>Id.</u>) On examination, she was alert and oriented to time, place, and people and she had a good recent and remote memory. (<u>Id.</u> at 110.) Her attention span and concentration were normal. (<u>Id.</u>) She had pain in her hands and ankles, and she was overweight (she weighed 222 pounds). (<u>Id.</u>) Plaintiff had a full range of movement, and could stand on her tip toes, heels, or either foot. (<u>Id.</u> at 111.) Her muscle strength in her upper and lower extremities was five out of five. (<u>Id.</u>) She had, however, "a positive right Tinel's sign and increased vibratory threshold in [her] lower and upper extremities." (<u>Id.</u> at 116.) Dr. Hayat's impression was of sensorimotor polyneuropathy and "probably superimposed carpal tunnel syndrome, worse on the left side." (<u>Id.</u> at 112, 116.) Although he opined that this was probably secondary to the SLE, Dr. Hayat concluded that other explanations needed to be explored. (<u>Id.</u>) Consequently, Plaintiff was to undergo further tests and was prescribed Pamelor for her neuropathic pain. (<u>Id.</u>) She was also prescribed splints for both hands. (<u>Id.</u> at 116.) The serum and urine protein electrophoresis were conducted the same day. (<u>Id.</u> at 114-15.)

An MRI of her brain and MRA of her head were each normal. (<u>Id.</u> at 155.)

On June 27, Plaintiff consulted Dr. Varshney.  (Id. at 118-19.)  She reported that the night before she had been awakened by pain in her shoulder blades.  (Id. at 118.)  She had also been short of breath.  (Id.)  The latter had resolved with the use of Albuterol.  (Id.)  The pain persisted, but was less severe.  (Id.)  Her asthma had been well-controlled, and she had not had to use Aluberol until then.  (Id.)  She was still dropping things at work.  (Id.)  Plaintiff was additionally prescribed Darvocet and cautioned about its habit-forming potential.  (Id.)  Dr. Varshney noted that Plaintiff's carpal tunnel syndrome had not improved with the braces and concluded that surgery might be necessary.  (Id. at 119.)  Plaintiff was to follow-up with the Neurology Clinic in two weeks.  (Id.)

Plaintiff did.  On examination, Plaintiff had "1+ ankle jerks and down going toes.  She had decreased pinprick sensation in a stocking-glove distribution."  (Id. at 125.)  She still had bilateral hand pain, and was to be referred to the Hand Clinic for possible surgical release.  (Id. at 125-26.)  She was also prescribed Pamelor.  (Id.)

Plaintiff also consulted the Division of Rheumatology and reported that she had been well since her last visit although she had seen her primary care physician for her pleuritic chest pain and had been prescribed Darvocet.  (Id. at 123.)  She had no pain or swelling in her joints, although she was tired and her muscles were stiff in the morning.  (Id.)  Her SLE was described as stable.  (Id. at 124.)  She was to be continued on the Celebrex and restarted on the prednisone, with a goal of gradually decreasing the dosage.  (Id.)

On week later, on July 30, Plaintiff consulted a physician for pre-conception counseling.  (Id. at 127-30.)  She reported that her last SLE flare up was approximately six

months before.  (Id. at 127.)  She also reported that she took Albuterol for her asthma, described as "mild and intermittent," but did not use it every week.  (Id. at 127, 129.)  She had an appointment with a surgeon for her carpal tunnel syndrome.  (Id. at 128.)

Plaintiff consulted Mitchell B. Rotman, M.D., in August about her bilateral hand pain.  (Id. at 194-95.)  She reported dropping things, difficulty writing, and numbness and tingling in her fingers.  Nerve studies, performed in April, showed "definite peripheral neuropathy with decreased nerve conduction velocity of the radial, ulnar and median nerves."  (Id. at 194.)  There was no clear evidence of carpal tunnel, and x-rays of her left wrist were normal.  (Id.)  Grip strength on her right and left were 35 pounds.  (Id.)  Pinch strength on her right was 14 pounds, on her left it was 12.  (Id.)  After tapping on Plaintiff's fingers and wrist caused numbness, Dr. Rotman questioned the credibility of her positive Phalen's and Tinel's signs at the carpal tunnels.  (Id.)

On September 11, Plaintiff went to the SLU emergency room with complaints of right toe and heel pain for the past week.  (Id. at 132-33.)  The week before, she had had cramps in her calf.  (Id. at 132.)  That condition had improved, but she now had the pain.  (Id.)  She had no other complaints.  (Id.)  The diagnosis was of soft tissue inflammation thought not to be secondary to the SLE.  (Id.)  She was directed to wear comfortable shoes and rest her foot.  (Id.)  She was to call if she continued to have problems.  (Id.)

Plaintiff did not keep her October Neurology Clinic appointment, but she did keep the November appointment.  (Id. at 134-36.)  Her medical history included SLE, asthma, obesity, and carpal tunnel syndrome, and she presented with complaints of back and left hip pain.

(Id. at 134.)  She had been injured in a motor vehicle accident,[5] and her SLE had subsequently flared up.  (Id.)  She had also started having low back pain – a dull, aching pain – which was worse with standing.  (Id.)  Her dosage of prednisone was increased.  (Id.)  An x-ray was to  made of her left hip, injured in the accident.  (Id. at 135.)  A later magnetic reasoning imaging ("MRI") of her left hip was normal.  (Id. at 178.)

Plaintiff again saw Dr. Ince in December 2001.  (Id. at 196.)  She next saw him on January 2, 2002, with complaints of fatigue and left hip pain.  (Id. at 196-98.)  Vioxx was causing her diarrhea.  (Id. at 196.)  Two weeks later, Plaintiff reported feeling less fatigued but having more pain in her left hip and hands.  (Id. at 199.)  She had no chest pain or shortness of breath.  (Id.)  Her dosage of Invron was increased and she was to return for another follow-up in two weeks.  (Id.)  After getting the results of Plaintiff's blood tests, Dr. Ince advised her in February to stop taking the Invron, increased her dosage of prednisone, and started her on CellCept.  (Id. at 200.)  Two weeks later, on February 27, Plaintiff reported that she had not taken the CellCept because she had lost the prescription.  (Id. at 201.)

On March 6, Plaintiff followed up with Dr. Varshney about her left hip pain.  (Id. at 137-39.)  An x-ray and MRI of that hip were both normal.  (Id.)  An SLE flare up was ruled out as the source of the pain.  (Id. at 138.)  On examination, Plaintiff had a normal gait and

---

[5]Plaintiff went to the SLU emergency room on October 11 after being in the accident.  (Id. at 170-77.)  Although she had initially felt fine after the accident, she later was dizzy and nauseous and had pain in her neck, back, and left shoulder and hip.  (Id. at 174.)  A CT of her brain was normal.  (Id.)

could walk heel to toe.  (Id.)  Her asthma was stable.  (Id. at 139.)  The etiology of her hip pain was "unclear."  (Id.)  Physical therapy and occupational therapy were to be prescribed.  (Id.)  Plaintiff also wanted certain blood tests done before her marriage.  (Id.)

On March 20, Plaintiff consulted Dr. Ince about severe pain in her upper extremities.  (Id. at 201.)  Her dosage of prednisone was increased, and she was started on Bextra.  (Id.)  She was also prescribed Darvocet, to be taken as needed.  (Id.)  Plaintiff reported doing better two weeks later.  (Id. at 202.)  She felt "achy," but did not have any chest pain or shortness of breath.  (Id.)  On May 1, she was to start water exercises and was to decrease her dosage of prednisone in small increments every other week.  (Id.)

The next day, Plaintiff went to the SLU emergency room with complaints of chest pain, vomiting, and dizziness.  (Id. at 179-91.)  The pain had lasted fifteen minutes.  (Id. at 181.)  She was referred to Dr. Varshney.  (Id.)  She consulted Dr. Varshney later that day about her chest pain.  (Id. at 140.)  She described the pain as lasting one to two minutes and as not radiating; she had no current symptoms.  (Id. at 140.)  Her vital signs were stable.  (Id.)  The etiology of her pain was unknown.  (Id.)  One week later, Plaintiff attributed the pain to stress at work and her wedding preparations.  (Id. at 141.)  After a discussion with Dr. Varshney about stress and anxiety, she decided to try anti-depressants.  (Id.)  She was to call if the medication had any side effects.  (Id.)

Several months later, on September 4, Plaintiff returned to Dr. Ince.  (Id. at 203.)  She had discontinued taking her medication due to insurance problems.  (Id.)  She was fatigued and had paranoid ideas.  (Id.)  She was started on her medications and was to call Dr.

Varshney if her paranoia persisted after taking them.  (Id.)  On September 17, Plaintiff reported that her pain and flexibility were better.  (Id. at 204.)  She still suffered from anxiety, but denied any suicidal ideation or hallucinations.  (Id.)  She was to call Dr. Varshney for a psychiatric evaluation.  (Id.)  When Plaintiff next saw Dr. Ince, on October 15, she reported that she had been to the emergency room twice with complaints of chest pain.  (Id.)  A chest x-ray had been normal and she was scheduled for a chest CT scan.  (Id.)

In October, Plaintiff went to the SLU emergency room with complaints of chest pain twice during a 36-hour period.  (Id. at 142.)  The pain was described as a deep chest pain radiating to the back.  (Id.)  An EKG was normal.  (Id.)  A CT scan without contrast of her chest and abdomen showed some soft tissue density; a CT scan with contrast was recommended.  (Id. at 192.)  She later described the chest pain to Dr. Varshney as increasing when she inhaled or was in a reclined position.  (Id.)  It could not be reproduced on examination.  (Id.)  Dr. Varshney ordered a CT scan of Plaintiff's chest on the unlikely chance that there was an aneurysm.  (Id. at 143.)

On January 7, 2003, Plaintiff was four weeks pregnant and consulted Dr. Ince.  (Id. at 237.)  She denied any joint pain, shortness of breath, or chest pain.  (Id.)  Until four days before, she had been taking CellCept.  (Id.)  Unfortunately, at her next visit, in June, Plaintiff reported that she had had a miscarriage.  (Id. at 238.)  She had also discontinued her medications because of an insurance problem.  (Id.)  She had complaints of fatigue and joint pain.  (Id.)  She was to be restarted on the prednisone and, if her laboratory test results were okay, on the CellCept.  (Id.)  A few weeks later, however, Plaintiff reported that she was not

able to resume the CellCept because of insurance problems. (Id. at 240.) Plaintiff's insurance problems and confusion persisted, and, in October, she again reported that she was not taking any medication. (Id. at 241.) She then complained of a general "achy" feeling and of left shoulder pain. (Id.) Plaintiff saw Dr. Ince again once in November, once in December, once in February 2004, and once in March. (Id. at 242-44, 246.) She complained of wrist pain in February and of right wrist pain in March. (Id. at 246.) She continued to be prescribed CellCept. (Id.)

Between Plaintiff's January and June visits to Dr. Ince, she went to the SLU emergency room several times. Once, in February 2003, she went for complaints of severe pain in her right arm and hand of two hours' duration. (Id. at 260-70.) She described the pain as having a sudden onset and starting in her neck and descending to her thumb. (Id. at 262, 264.) She was discharged with instructions to continue taking her current medications and to take two Darvocet every six hours as needed for the pain. (Id. at 261.) Three days before her June 4 appointment with Dr. Ince, Plaintiff returned to the emergency room with complaints of pain in all her joints for the past two days. (Id. at 271-82.) She had been off her medications since April 28 because her insurance would not pay for them. (Id. at 274.) A nurse and Plaintiff's husband investigated their insurance plan on the internet and discovered that the insurance company had a mail order prescription plan that they could afford. (Id. at 278.) She was discharged four hours later with a prescription for Indocin, to be taken every eight hours as needed for pain, and instructions to follow up with her private physician in one or two day. (Id. at 272.)

Late in the evening on July 13, Plaintiff went to the emergency room with complaints of chest pain.  (Id. at 283-97.)  A chest x-ray was normal.  (Id. at 296.)  The diagnosis was non-cardiac chest pain.  (Id. at 284.)  She was discharged early the next morning with a prescription for Percocet and instructions to rest for 24 hours.  (Id.)

On February 14, 2004, Plaintiff returned to the emergency room for a swollen, painful right hand.  (Id. at 298-310.)  The pain had begun the day before.  (Id. at 301.)  An x-ray showed a normal wrist, with no fractures or dislocations and with a normal alignment.  (Id. at 310.)  Her wrist was aspirated.  (Id.)  On discharge, she was given an Ace bandage and instructions to double her prednisone dose, to return if she had an increase in pain, warmth, or redness, and to follow-up with her primary care physician.  (Id. at 299.)  The diagnosis was an SLE flare up.  (Id.)

Additionally, while she was consulting Dr. Ince, she continued to consult her primary care physician, Dr. Varshney.  (Id. at 312-14.)  On January 20, 2003, she reported that she had had a miscarriage, but was feeling better.  (Id. at 312.)  Her asthma and lupus were both well controlled and stable.  (Id.)  Dr. Varshney did engage in a detailed discussion with her about diet and exercise and eating less.  (Id.)  Plaintiff then weighed 260 pounds.  (Id.)

Plaintiff had gained 17 pounds at her next visit, in June.  (Id. at 314.)  She had also run out of medications due to insurance problems.  (Id.)  She had complaints of a dry cough for the past three or four weeks.  (Id.)  Over-the-counter medications had not helped.  (Id.)  She was feeling depressed and sleeping poorly.  (Id.)  Her appetite was less, and she was frustrated with her weight gain.  (Id.)  She had lost interest in things she used to enjoy, and

did not want to get out of bed in the morning.  (Id.)  On examination, she was alert and oriented times three and was tearful.  (Id.)  Plaintiff was given samples of Lexapro.  (Id.)  Plaintiff did not keep her next three appointments.  (Id. at 316.)  Her prescriptions were renewed at the next appointment she kept, in December.  (Id.)  At that time, she consulted Doug Walden, M.D.  (Id.)  Dr. Walden noted as follows:

> The patient is a 27-year old female former patient of Dr. Varshney.  She has a history of [SLE], asthma, obesity, depression, gastroesophageal reflux, and carpal tunnel syndrome.  Her last visit to Dr. Varshney was June 6, 2003.  She follows with Dr. Ince of Rheumatology for her lupus.  She is out of medications at this time and requests refills.  She states she has significant fatigue and depression.  There have been recent illnesses in the family and her husband is actually being admitted to the hospital at this time for a respiratory problem.  She notes pretty persistent and constant fatigue.  She did note improvement when she started Lexapro 10 mg each day.  She took this for approximately two months before she ran out of medication and did not get refills.  She has a history of asthma but no current complaints, shortness of breath or wheezing.  There is no cough, sputum, fever or chills.  Apparently, her major manifestation of her lupus is chest pain with pericarditis.  She has had no symptoms from that since her last visit to the [ER] in July 2003.

(Id. at 317.) Her current medications were listed as prednisone, CellCept, Darvocet, Restoril, Protonix, and Lexapro.  (Id.)  Her diagnosis was fatigue, depression, SLE, gastroesophageal reflux disease ("GERD"), and asthma.  (Id. at 317-18.)  She was to be restarted on Lexapro for her fatigue and depression, to continue to follow-up with Dr. Ince for her SLE, to be restarted on the Protonix for her GERD and on Flovent for her asthma, and to use her Albuterol on an as-needed basis.  (Id. at 317-18.)  Additionally, she was advised to consider counseling and regular aerobic exercise.  (Id. at 317.)

On January 8, 2004, Plaintiff went to the emergency room with complaints of low back pain for five days, a dry cough and sore throat for two days, and chills. (Id. at 321-23.) Her temperature was normal. (Id. at 321.) She was diagnosed with an upper respiratory infection. (Id.) Six days later, she was examined at the SLU Eye Institute for possible glaucoma. (Id. at 324.) The impression was that she might have chronic open angle glaucoma. (Id.) She was to return in one year. (Id.)

The next month, Plaintiff consulted Dr. Walden. (Id. at 325.) Plaintiff reported that there was a little improvement in her depression, but she still had mood swings and crying spells. (Id.) Also, her joints ached if it was cold. (Id.) She was continued on the Prilosec for her GERD. (Id.) Dr. Walden stressed the importance of exercise, and increased her dosage of Lexapro. (Id.)

In March, Plaintiff was seen by a SLU surgeon for her complaints of painful and swollen wrists, the right hurting more than the left, for three weeks. (Id. at 326.) She had gone to the emergency room on February 14 and her right wrist had been aspirated. (Id.) The pain had been attributed to an SLE flare up. (Id.) She wore an Ace bandage and kept her right wrist elevated. (Id.)

The ALJ also had before him a Physical Medical Source Statement completed by Dr. Ince in November 2002. (Id. at 205-07.) He reported that, inter alia, she did not medically require an assistive device for ambulation; she was able to occasionally lift and carry 20 pounds and frequently lift 10 pounds; she could walk for less than 2 hours total, stand for at least 2 hours, and sit for less than 6 hours in an 8-hour workday; she did need to alternate

sitting and standing to relieve her pain and discomfort; and she could only occasionally climb, stoop, crouch, balance, and kneel.  (Id. at 205-06.)  Asked whether she could sustain a 40-hour workweek on a continual basis, Dr. Ince reported that she may have difficulty when her SLE flared up and that she usually felt muscle pain rather than joint restriction. (Id. at 207.)

Pursuant to Plaintiff's DIB and SSI applications, Ofelia E. Gallardo, M.D., completed a Psychiatric Review Technique form in January 2003.  (Id. at 223-36.)  Dr. Gallardo concluded that Plaintiff had a medically determinable affective disorder[6] and a medically determinable anxiety-related disorder, specifically "symptoms of anxiety," but neither satisfied the relevant diagnostic criteria and neither was severe.  (Id. at 226, 228.)  Dr. Gallardo further concluded that Plaintiff's mental disorders created only a mild limitation in her ability to function in the areas of (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence, or pace.  (Id. at 233.)  It resulted in no episodes of decompensation of extended duration.  (Id.)  Dr. Gallardo based her conclusions on the lack of any referral by Plaintiff's treating physician to a psychiatrist, the prescribing of psychiatric medications by the treating physician and not by a psychiatrist, and the lack of a diagnosis.  (Id. at 235.)  Dr. Gallardo further noted that Plaintiff did not allege a mental problem.  (Id. at 236.)

_____

[6]The name of that disorder is illegible.  (Id. at 226.)

- 18 -

The same month, Plaintiff's physical residual functional capacity was assessed by a disability counselor.  (Id. at 214-21.)   Her primary diagnosis was listed as SLE; her secondary as asthma.  (Id. at 214.)  It was concluded that she had the capacity to occasionally lift ten pounds; frequently lift less than ten pounds; stand or walk at least two hours in an eight-hour workday; and sit about six hours in an eight-hour work day.  (Id. at 215.)  Her ability to push or pull was unlimited.  (Id.)  She had occasional postural limitations as result of her SLE, but had no manipulative, visual, or communicative limitations.  (Id. at 216-18.)  Her only environmental limitation was the need to avoid "[f]umes, odors, dusts, gases, poor ventilation, etc." because of her asthma.  (Id. at 218.)  The counselor noted that Dr. Ince had stated that Plaintiff needed no assistive device.  (Id.)

### The ALJ's Decision

The ALJ first concluded that the medical evidence established Plaintiff had lupus and a history of asthma, controlled by medication, but these impairments were not severe enough to meet or medically equal one in the Regulations.  (Id. at 14.)  After then summarizing Plaintiff's testimony and the medical evidence, the ALJ noted "that no doctor who has treated or examined the claimant has stated or implied that she is disabled or totally incapacitated." (Id. at 17.)  Dr. Ince had stated that Plaintiff was limited to walking and sitting[7] less than two hours; however, he had not stated "just how much less."  (Id.)  Because of this lack of specificity, the ALJ was "unable to attribute great weight to Dr. Ince's limitations."  (Id.)

---

[7]The ALJ misstates Dr. Ince's conclusions.  Dr. Ince had concluded that Plaintiff could walk less than two hours during an eight-hour work day and *stand* at least two hours.

The ALJ further noted that Plaintiff had not been hospitalized at any time for her condition. (Id.) There was also no indication in the record that her asthma imposed any limitations on her ability to function or perform work-related activities. (Id.) Nor was there any indication that Plaintiff had ever received any psychiatric treatment or counseling or that her abilities to function, communicate, socialize, or handle stress were impaired. (Id.) There had apparently been no deterioration in her personal hygiene or habits. (Id.)

Contrary to Plaintiff's complaints of myalgias and fatigue, no physician had ever required that she rest during the day or had referred her to a pain specialist or clinic. (Id. at 18.) Nor had any physician limited her daily activities. (Id.) And, although Plaintiff had alleged multiple side effects from her various medications, with the exception of the diarrhea caused by the Vicodin,[8] these side effects were not in the record. (Id.) The ALJ then concluded that Plaintiff's allegations as to the precipitation and aggravation of her physical and mental symptoms were not credible, substantiated by the medical record, or consistent with the record as a whole. (Id.)

Plaintiff had the physical residual functional capacity found by Holmes, but could not return to her past relevant work. (Id.) She could, however, perform a range of sedentary work[9] as provided for by the Medical-Vocational Guidelines and was not disabled within the meaning of the Act. (Id. at 18-19.)

---

[8]It was Vioxx that caused diarrhea. (Id. at 196.)

[9]Sedentary work requires lifting no more than 10 pounds at a time and occasional walking and standing. 20 C.F.R. § 404.1567(a).

**Legal Standards**

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the "special technique" set forth in 20 C.F.R. § 416.920a. 20 C.F.R. § 416.920a(a). This technique requires that the claimant's "pertinent symptoms, signs, and laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations

in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the

duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  See **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).  The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

After a claimant's RFC is determined, the ALJ must compare that RFC to the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1560(b), 416.960(b). If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner may meet her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grids may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07.  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion.  **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998).  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, specifically that the ALJ erred by not giving the proper weight to the opinion of  Dr. Ince about her RFC.  The Commissioner disagrees.

"'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alterations in

original).  Accord **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995).  The longer a claimant's physician has treated her and the more times, the more weight is given to that physician's opinion.  20 C.F.R. § 404.1527(d)(2)(i).  And, the more knowledge a physician has about the claimant's impairments, the more weight is given to that physician's medical opinion.  20 C.F.R. § 404.1527(d)(2)(ii).  "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion."  20 C.F.R. § 404.1527(d)(4) (alterations added).  More weight is generally given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

Dr. Ince, a rheumatologist, treated Plaintiff eight times over a 20 month period before completing his Physical Medical Source Statement.  The examiner, the credentials of whom are not in the record, never examined Plaintiff but did review Dr. Ince's Statement.  Although the ALJ states that the examiner reviewed the records of evidence, the only reference in the examiner's assessment is to Dr. Ince's Statement.  Dr. Ince concluded that Plaintiff could walk less than two hours during an eight-hour work day.  This conclusion is indicated by a check on the line next to "Less than 2 hours total in an 8-hour workday?"  This is one of three options under the query about how much total walking the patient is capable of in an eight-hour day.  Dr. Ince also concluded that Plaintiff could stand at least two hours during an eight-hour work day.  This conclusion is indicated by a check on the line next to "At least 2 hours total in an 8-hour workday?"  This also is one of three options under a query about

how much total standing the patient is capable of in an eight-hour day. (The third option is "Abut six hours in an eight-hour workday?") The ALJ discounted Dr. Ince's opinions on the basis that he did not specify how many hours. On the other hand, the ALJ gave the opinions of the non-examining counselor, who refers only to Dr. Ince's Statement and not to any of the medical evidence in the record, controlling weight. These opinions were also indicated by checkmarks in response to similar queries with *identical* options. The ALJ fails to explain why Dr. Ince, a treating specialist, was at fault for a lack of specificity in his conclusions when the standard form routinely completed by SSA claimants has the identical general options. Moreover, because the ALJ discounted Dr. Ince's opinion, he did not consider Dr. Ince's conclusion that Plaintiff needed to alternate sitting and standing to relieve her discomfort.

Plaintiff argues that the ALJ's error in discounting Dr. Ince's conclusion requires a remand for the award of benefits. Although the Court finds the ALJ relied on an improper basis for discounting Dr. Ince's opinion, the Court further finds that the award of benefits is not merited on the record before it.

As noted by the Eighth Circuit Court of Appeals in **Bowman v. Barnhart**, 310 F.3d 1080 (8th Cir. 2002), "[s]ystemic lupus is 'a chronic, remitting, relapsing, inflammatory, and often multisystemic disorder of connective tissue." **Id.** at 1084 (quoting Kelley v. Callahan, 133 F.3d 583, 585 n.1 (8th Cir. 1998)) (alteration added). "In other words, the symptoms of systemic lupus, such as pain and swelling, can flare-up, subside, and flare-up again." **Id.** Neither Dr. Ince nor the non-examining counselor addressed the ebb-and-flow nature of the

symptoms of SLE when assessing Plaintiff's RFC. Rather than discount Dr. Ince's checkmarks while according weight to the counselor's checkmarks, the ALJ should have developed the record as to Plaintiff's RFC when there was such a clear discrepancy.

"[I]t is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000) (alteration added). Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003). This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added). This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). See also **Haley v. Massanari**, 258 F.3d 742, 749 (8th Cir. 2001) (holding that ALJ's duty to develop the record includes ordering a consultative examination when such an examination is necessary for the ALJ to make an informed decision); **Barrett v. Shalala**, 38 F.3d 1019, 1023 (8th Cir. 1994) ("The ALJ is required to order medical examinations and tests only if the medial records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."); 20 C.F.R. § 416.917 (setting forth criteria for when a consultative examination will be provided at Government expense).

The ALJ lacked the required adequate basis to assess Plaintiff's RFC. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED

and this case is REMANDED for further proceedings consistent with this Memorandum and

Order.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of February, 2006.